BOYLE vs. THE STATE.

*February 3 — May 31, 1883.*

CRIMINAL LAW AND PRACTICE. *(1) Reading medical books in evidence or on argument. (2) Murder or manslaughter?*

1. Medical books cannot be introduced in evidence, nor can an expert witness be permitted to testify as to statements made therein. And it is equally inadmissible to permit the reading of such books to the jury by counsel.

2. Where the nature of an assault is such that if death accidentally ensued, the killing would be murder at the common law, it would be manslaughter in the first degree under the statute (R. S., sec. 4346), unless such assault was accompanied with an actual design to do some great bodily harm, or to commit some one of the crimes mentioned in sec. 4385, R. S., so that such assault would be a felony.

ERROR to the Circuit Court for *Dodge* County.

The case is stated in the opinion.

*E. Elwell*, for the plaintiff in error.

*H. W. Chynoweth*, Assistant Attorney General, for the defendant in error.

TAYLOR, J.   The plaintiff in error was tried in the circuit court upon an information charging him with the murder of his wife.   The jury found him guilty of murder in the second degree, and the court sentenced him to imprisonment in the state prison for the term of fourteen years. After verdict, and before sentence, the plaintiff in error made a motion to set aside the verdict and for a new trial, for errors occurring in the course of the trial, and because the verdict is not supported by the evidence.   The death of the wife of the accused occurred either on Wednesday the 11th, or Thursday the 12th, of January, 1882, at the house of the accused.   The evidence shows that for several days previous to the 12th of January the accused and his wife had been on a drunken debauch, and that on Wednesday, the 11th of January, they had been to the city of Columbus, drinking quite freely, and when they went home in the afternoon took with them one gallon of whisky and half a gallon of wine.   They went home in a double sleigh; were seen by several persons on the way. Most of the way home the deceased sat with the accused on the seat, but at one time she got down from the seat and was leaning over the dash-board with her breast against it, and accused helped her up on the seat again.   After they got home, on the evening of Wednesday, they were not seen by any one until the afternoon of Thursday, when the accused came out of his house with his overcoat on and called to a neighbor who was near by to come quick; that his wife was dead.   He said to another witness that she died about two o'clock.   The accused seemed stupefied and could not talk plainly.   When the deceased was first seen by the witnesses after her death, she was lying on the front side of the bed,

on her right side, face towards the wall, head to the east on a pillow, all her clothes on, shawl and nubia, apparently the same she wore on her return from Columbus the day before. A *post-mortem* examination was made and the deceased buried. Thirteen days later her body was taken up and a second examination made. It is unnecessary here to give any particular statement of the result of such examinations. It is sufficient for the purposes of this case to state that all the experts engaged in the examination came to the conclusion that the immediate cause of the death of the deceased was suffocation, strangulation, or *asphyxia*. The theory of the prosecution was that the strangulation was produced by the accused by choking with his hand, pressing upon her neck, and, as supporting this theory, the medical witnesses who were present at the first examination testified that there were discolorations upon her neck which might have been made by the hand of a man clasping the neck. These discolorations had disappeared when the second examination was made. Some of the expert witnesses thought the death of the deceased might have resulted from causes other than the application of pressure upon her throat by the hand of the accused, or any other person; that death might well have ensued as the consequence of the drunken debauch in which she had been indulging immediately previous thereto. As the case now appears to us, the most important question in the case for the jury to determine was whether the deceased's death was caused by violence applied by some other person, or whether her death was the result of her debauch. If it had been clearly shown that her death was the result of the force and violence of some person other than herself, there would be little doubt as to the person who must have applied such violence, as the evidence tended very strongly to show that no person had access to her after she entered her house on the evening of Wednesday until her death on Thursday, except the accused. Whether or not a homicide had in fact

been committed, was the real difficult question in the case. If that fact was once satisfactorily established, there could be but little room for doubt under the evidence as to the guilt of the accused.

From an examination of the expert testimony in the case it is not made perfectly clear that the deceased came to her death by violence inflicted upon her by any one. The only marks and appearances upon her person which would indicate that fact with any decree of clearness, were the discolored spots in her neck, and the condition of some of the vital organs immediately after her death. The fact that the discolored spots on the neck of the deceased had entirely disappeared at the time of the second examination tended to show that the force which made them, if caused by force at all, was not very great or violent in its character, and shows the pertinency of the evidence offered by the prosecution tending to prove that death might be caused by strangulation without leaving any external marks of violence. It became, therefore, a question of the greatest importance in the case that the expert testimony which was offered on the part of the prosecution tending to show that the condition of the vital organs immediately after her death was such as would indicate death by strangulation, should be of an unexceptionable character, as it is very clear that the slight discolorations on the neck of the deceased were not in themselves sufficient evidence of strangulation. It is claimed by the accused that they might have been caused by her leaning against the dash-board of the sleigh with her head over the same on her return home the day before her death. These discolorations, if accompanied by the other conditions of the vital organs and the general appearance of the dead body which are usually present after strangulation, would strengthen the conclusion that the death was caused in that way. It became necessary on the trial that the expert witnesses should be able to tell the jury what appearances the

dead body would exhibit, externally and in the vital organs, when death was caused by strangulation, so that they could determine the question of fact whether the deceased came to her death in that way, by comparing the appearances found by the expert witnesses in their examination of the deceased with those which ordinarily follow death from such cause. The admission of any improper testimony bearing upon this vital issue in the case would necessarily prejudice the plaintiff in error, and compel a reversal of the judgment.

Upon the trial, Dr. Cody, a witness for the state, was permitted to answer a hypothetical question, including a statement of the appearances which the state claimed to have proved were found on the deceased, except the marks on the throat, calling for his opinion as to what was the cause of her death, and he answered, "I judge the deceased died from suffocation; *asphyxia*, sometimes called." He was then asked that if, in addition to these appearances, marks were found on her throat, what his conclusion would be, and he answered, "That she died of strangulation." The following question was then put to the witness: "Do you know, from books or otherwise, whether death is ever produced from strangulation without leaving marks upon the throat; that is, your own personal observation?" This question was objected to; objection overruled, and exception taken. He answered, "In Taylor's Jurisprudence such cases are recorded." *Q.* "In standard medical works?" *A.* "Yes, sir." *Q.* "Is Taylor's standard?" *A.* "Yes, sir." The following questions and answers were permitted by the court: *Q.* "Were you called to a person soon after death and found the face suffused with blood, dark purplish color; lips livid, dark; eyes prominent, colored; mouth open more or less; tongue bruised,— in such a case as that your judgment would be that death resulted from strangulation?" Objected to; objection overruled, and exception taken.

*A.* " Yes, sir; with those appearances of the face. Both sides, both cavities of the heart opened. Third, blood was found in one cavity; I think on the right side liquid blood, and the coagulation in the left." *Q.* " In cases of death by *asphyxia* or strangulation, how is the blood usually found in the heart,— in the condition found there or otherwise?" *A.* " That would be the usual condition. I remember that the books state that the blood should be coagulated on the right side, and not on the left. I do not know. I have not seen a case of strangulation. I do not know by experience." *Q.* " Do you know if the books,— standard authority on the question,— lay it down that in case where death has resulted from smothering or strangling a person by applying the hand over the mouth and nostrils that it has been produced without leaving external signs?" Objected to by defendant; objection overruled, and exception taken. *A.* " It is so stated by the books. Could not name the books in particular cases. They are standard medical books. I think, further, that there are some cases of little or no signs found after death, partly from the blood being fluid." In connection with this evidence we quote what took place when the counsel for the state commenced summing up the case to the jury. The record reads as follows: " The counsel for the state, in opening the argument to the jury and in his argument, commenced to read to the jury from medical books, which it was claimed by the counsel had been proven to be standard medical authorities. The attorneys for the defendant then and there objected to reading from said books to the jury, because they were not offered in evidence, and, upon such objections made, the court said: ' He may read from medical books shown on the stand to be standard authority in the profession, within a reasonable limit;' to which ruling and decision of the court the defendant excepted, and counsel for the state proceeded to read and did read from said books to the jury, without interruption from the court."

It seems to us that the court erred in permitting Dr. Cody to testify as to what was said in standard medical works upon the subject of strangulation, and what effects would be produced upon the body of the deceased when death resulted from such cause. The admission of such evidence is in direct conflict with the ruling of this court in the case of *Stilling v. Town of Thorp*, 54 Wis., 528. In that case the question of the admission of medical works in evidence was fully discussed, and it was held that they were not admissible. In addition to the cases cited by Justice CASSODAY in that opinion, we cite the following cases sustaining the ruling in that case: *Whiton v. Insurance Companies*, 109 Mass., 24; *Fowler v. Lewis*, 25 Tex. (Supp.), 380; *Collier v. Simpson*, 5 Car. & P., 73; *Regina v. Taylor*, 13 Cox's Crim. Cas., 77; *Carter v. State*, 2 Ind., 617; *State v. O'Brien*, 7 R. I., 336; *Ware v. Ware*, 8 Me., 42; *Davis v. State*, 38 Md., 15, 36; *Comm. v. Brown*, 121 Mass., 69, 75; *Fraser v. Jennison*, 42 Mich., 206, 214; *Pinney v. Cahill*, 48 Mich., 584; *People v. Hall*, 48 Mich., 482; *Harris v. Panama R. R. Co.*, 3 Bosw., 1, 18; Rogers on Expert Test., 237–243. The author of this treatise cites the authorities showing that evidence of this kind is held not admissible by the English courts, and the courts of Indiana, Maine, Maryland, Massachusetts, Michigan, North Carolina, Rhode Island, Wisconsin, California, and New Hampshire, and admissible in the states of Iowa and Alabama. The rule stated by this court in 54 Wis., *supra*, was followed in the case of *Knoll v. State*, 55 Wis., 249, 256. The authorities cited clearly show the correctness of the rule stated by this court in *Stilling v. Town of Thorp, supra*. If it be urged that the works of medical writers were not in fact offered in evidence, but that the witness was called upon to testify as to what certain medical works contained on the subject under investigation, it cannot help the state, as in such case the attempt is to put in evidence what is stated by a medical author upon the subject of inquiry, without producing the book, and depending upon the memory of the

witness. Certainly, if the book itself cannot be read in evidence to the jury, the witness cannot be permitted to give extracts from it as evidence, depending upon his memory for their correctness. The palpable error in permitting Dr. Cody is apparent from the fact that he testified on the stand that he had no personal knowledge on the subject he was testifying about. He says: "I have not seen a case of strangulation, and do not know by experience."

The comment made by Chief Justice STOW in the case of *Luning v. State*, 2 Pin., 284–288, is quite pertinent as applied to this case, viz.: "From this examination alone, and aside from the objection of the district attorney that the witness could not testify to facts not within his knowledge, it is manifest that the purpose of the question and proposition was to extract from the witness evidence of facts derived from his scientific, and not his personal, knowledge; or, in other words, that he was to swear to facts, the existence of which he only knew from his reading; and this, upon no principle of evidence, could be admitted." The effect of the evidence given under objection by Dr. Cody was to put before the jury as evidence what the medical works laid down as evidences of strangulation. If this may be done indirectly by the oral testimony of the person who has read the medical works, it would certainly be a much safer rule to permit the books themselves to be read to the jury as being better evidence of the fact. We think the learned circuit judge also erred in permitting the counsel for the state to read the medical authorities to the jury in the opening of his argument. It is evident they were not read by way of illustrating the argument of the counsel, but to give the jury a clear view of what such medical writers laid down as the evidence of strangulation. The jury must have understood that the extracts read to them were so read for the purpose of having them considered in determining the question of fact whether the deceased came to her death by strangulation. Many of

the authorities above cited hold that it is equally inadmissible to permit the reading of such works to the jury by counsel, as to read them in evidence on the trial. It is apparent that if counsel are allowed to read extracts of medical authors in their argument to the jury, it would nullify the rule which prevents such extracts from being read in evidence. The following are some of the authorities holding it inadmissible for counsel to read medical works to the jury: *Queen v. Crouch*, 1 Cox's Crim. Cas., 94; *Regina v. Taylor*, 13 id., 77; *Washburn v. Cuddihy*, 8 Gray, 430; *Wade v. De Witt*, 20 Tex., 398; *Ashworth v. Kittridge*, 12 Cush., 194; *Huffman v. Click*, 77 N. C., 55; *Fraser v. Jennison*, 42 Mich., 206–214; *Robinson v. N. Y. C. & H. R. R. R. Co.*, 24 Alb. L. J., 357; *People v. Wheeler*, 60 Cal., 581; *People v. Hall*, 48 Mich., 482.

The reason for prohibiting the reading of such works to the jury on the argument is briefly stated by Baron ALDERSON in the case of *Queen v. Crouch, supra*. He said to counsel: " I should not allow you to read a work on foreign laws. Any person who was properly conversant with it might be examined, but then he adds his own personal knowledge and experience to the information he may have derived from books. We must have the evidence of individuals, not their written opinions; we should be inundated with books if we should hold otherwise." Clarkson, of counsel, remarked: "I shall prove the book to be one of high authority." To this Baron ALDERSON replied: " But can that mend the matter? You surely cannot contend that you may give the book in evidence, and if not, what right have you to quote from it in your address, and do that indirectly which you would not be permitted to do in the ordinary course? " It seems to me that the answer of the learned judge to the counsel in that case, that he should not be permitted to do indirectly what he could not do directly, is an insuperable objection to allowing the counsel to read to the jury, in his summing up, extracts

from medical or scientific works of any kind which he would not be permitted to read in evidence to them on the trial. In *People v. Hall, supra,* Justice CAMPBELL, of the supreme court of Michigan, says, speaking of reading scientific works to jurors: "If jurors could be safely trusted with the interpretation of such books, it is hard to see on what principle living witnesses would be required. Scientific men are supposed to be able, by their study and experience, to give the general results accepted by the scientific world, and the extent of their knowledge is tested by their personal examination. But the continued changes of view brought about by new discoveries in most matters of science, and the necessary assumption of scientific writers of some technical knowledge in their readers, renders the use of their works before juries, especially in detached portions and selected passages, not only misleading, but dangerous. The weight of authority, as well as of reason, is against their reception."

On account of the error in permitting the witness, Dr. Cody, to testify as to what certain medical works stated upon the subject of inquiry, and for permitting the counsel for the state to read from medical works to the jury, the judgment of the circuit court must be reversed, and a new trial ordered.

The learned counsel for the plaintiff in error urged upon the court that the circuit judge erred in refusing certain instructions asked on behalf of the defendant, and in some parts of the general charge given. We have not deemed it necessary to give these alleged errors a very careful examination; but after a careful reading of the charge given by the learned circuit judge, we think it presented the main questions in the case fairly and fully, and that the instructions asked and refused were given in the general charge, so far as the defendant was entitled to have them given to the jury. The only matter in the charge upon which we have any doubt is that part of it which relates to manslaughter in the

first degree. The learned circuit judge said to the jury: "If the killing is done while the slayer is engaged in the perpe- tration of any crime, misdemeanor, or attempt to commit such crime or misdemeanor, or where such killing would be murder at the common law, it is manslaughter in the first degree. And I understand the words, 'where such killing would be murder at the common law,' to mean that there must be such intent to kill as the law imputes; that is, constructive intent as distinguished from actual in- tent. . . . From the previous reading of the statute defining manslaughter in the first degree, I do not think the jury can convict of manslaughter in the first degree. Should they fail to convict the defendant of murder in the first or second degree, then, if they convict at all, it can only be of manslaughter in the second degree; for if the intent is not found, as in murder, it would not be murder at common law, as required in manslaughter in the first degree."

It is evident the learned judge failed to give the exact definition of manslaughter in the first degree by omitting the words "not amounting to a felony" after the word "misdemeanor," in the first part of the sentence; by insert- ing the word "or" before the last part of the sentence; and in using the word "intent" instead of "malice" in several places. But this is of no very grave importance, as he in- structed the jury that they could not, under the evidence, convict the defendant of manslaughter in the first degree, in any event. This position taken by the circuit judge is de- fended by the attorney general in a very pointed argument, in which he attempts to prove that the crime of man- slaughter cannot be committed under the present statute, when the only crime or misdemeanor in which the accused is engaged at the time of the killing is a personal assault or assault and battery upon the deceased; and he insists that the case of *Rowan v. State*, 30 Wis., 129, which holds the contrary doctrine, ought to be overruled. The argument is,

as I understand it, as follows: To constitute murder at the common law, when it results from a personal assault upon the deceased, not made with an intent to kill, the assault must be of such a character as to necessarily endanger the life of the person assaulted. The assault must be made with such a weapon or instrument as might endanger the life of the party assailed, or, if not made with a dangerous weapon, it must be made in such a manner as to threaten great bodily harm, at least, to the party assaulted. So far, we think, the learned counsel for the state is right. Justice Orton, in the case of *Pliemling v. State*, 46 Wis., 516, 520, says: " So, at common law, if a person commit a criminal misdemeanor which is of such a sort as to endanger life, so that the element of danger concurs with the unlawfulness of the act, the accidental causing of death is murder;" and this latter killing is by our statute manslaughter in the first degree; and this explains what is meant by the clause in the section defining it "in cases where such killing would be murder at the common law."

The attorney general argues that every assault which endangers life or threatens great bodily harm must be a felonious assault under the provisions of sec. 4377, R. S. 1878, which reads as follows: " Any person who shall assault another with intent to do great bodily harm shall be punished by imprisonment in the state prison not more than three years, nor less than one year, or in the county jail not more than one year, or by fine not exceeding $500, nor less than $100." This kind of an assault is made a felony by sec. 4637, R. S. 1878. It may well be claimed that if the jury find that the assault which resulted in death was made with intent to do great bodily harm, then they would be justified in finding the party making such assault guilty of murder in the third degree, and that in such case they ought not to find him guilty of manslaughter in the first degree, because the crime in which he was engaged at the time of the killing

was a felony, and not a crime or misdemeanor not amounting to a felony. It does not follow from this, by any means, that the accused might not be convicted of manslaughter in the first degree if death resulted from an assault upon the person killed which was of such a character as to endanger the life or threaten great bodily harm to such person. If the jury negatived the intent to kill or to do great bodily harm, then such assault would not be a felony unless made with intent to commit one or other of the crimes mentioned in sec. 4385, R. S. 1878. See *State v. Hammond*, 35 Wis., 315. So that if the nature of the assault be such that if death accidentally ensued it would be murder at the common law, it would be manslaughter in the first degree under our statute, unless the jury found that such assault was accompanied with an actual design to do some great bodily harm, or to commit some one of the crimes mentioned in said sec. 4385. We see no reason, therefore, for overruling the decision made in the case of *Rowan v. State*. In the case at bar the jury might have found from the evidence that the deceased came to her death by strangulation, and that the strangling was the act of the accused; yet that, under the proofs as to his drunken and besotted condition, there was an absence of any *actual design* on his part to kill her, or even to do her great bodily harm.

We think the learned circuit judge erred in saying to the jury that they would not be justified, upon the whole evidence, in convicting the accused of manslaughter in the first degree, but that if they convicted him at all they should convict of murder in the first or second degree, or of manslaughter in the second degree. And the error is equally manifest on the theory of the learned attorney general, for if the jury found that the accused did not, in fact, intend to kill the deceased, but did intend to inflict upon her great bodily harm, then they might have convicted him of murder in the third degree, coming within the provisions of sec. 4345,

R. S. 1878, and being a killing "without any design to effect death, by a person engaged in the commission of a felony." Whether the error of the judge in this respect would be sufficient ground for the reversal of the judgment is not determined. This question has been referred to by this court in the following cases: *Knoll v. State*, 55 Wis., 249; *Bennett v. State*, ante, p. 69. My own opinion as to what the trial court ought to do in a case of this kind is stated in the case of *Bennett v. State, supra.* As there must be a new trial in the case it is unnecessary to consider the other objections made by the counsel for the plaintiff in error.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remanded for a new trial. The warden of the state prison will surrender the plaintiff in error to the sheriff of Dodge county, who will hold him in custody until he shall be discharged or his custody changed by due course of law.