IN THE MATTER OF BETSEY ANN MASON, A SUPPOSED LUNATIC.

BETSEY ANN MASON, APPELLANT, v. ALANSON HICKS, RESPONDENT.

*Lunatic — evidence as to mental capacity — witness obtaining access to the lunatic by improper means — motive of witness as affecting his credibility — medical books.*

Upon the trial of a proceeding in the nature of a writ *de lunatico inquirendo* a physician was allowed to testify that the supposed lunatic had not sufficient mental strength to manage her estate or conduct the business connected with it. *Held,* that the admission of such evidence was error.

In such a proceeding it is proper to show, upon cross-examination, that an expert witness testifying against the alleged lunatic, in order to qualify himself as a witness, obtained admission to her house by fraudulent means, without the consent and against the will of those there present, and in the absence of her attending physician, whom these persons desired to have present.

A witness was allowed to answer a hypothetical question which was based in part upon proved facts, in part upon assumptions and in part upon the testimony of other witnesses.

*Held,* error; that hypothetical questions must be based upon facts admitted or established, or which, if controverted, might legitimately be found by the jury.

Upon such trial the petitioner, upon cross-examination, was asked whether he had not offered to drop the matter if paid a certain sum of money by the alleged lunatic. The question was excluded.

*Held,* that the question was competent as bearing upon the credibility of the witness.

Medical works cannot be read to the jury, nor can experts be asked questions based upon unverified statements made therein by their authors.

APPEAL by Betsey Ann Mason from an order, entered in the Onondaga county clerk's office on the 10th day of April, 1889, denying her motion for a new trial made upon the minutes of the court; and also from a judgment, entered in said clerk's office on the 11th day of March, 1889, confirming a verdict, rendered at a trial had in the County Court of Onondaga county before the court and a jury, and appointing a committee of said appellant as a lunatic.

On the 27th day of January, 1888, Alanson Hicks presented to the County Court of Onondaga county the petition by which this proceeding was instituted, asking that a committee of the person and property of the appellant should be appointed, and that a com-

mission should issue out of that court to inquire of the apparent lunacy of the appellant.

On the petition and affidavits accompanying it, the Onondaga County Court on that day entered an order that a commission in the nature of a writ *de lunatico inquirendo* issue out of that court, directed to Thurston D. Brewster, Esq., to inquire by a jury of the county of Onondaga of and concerning the lunacy of the appellant, and of her capability of managing her property, and that such commission be executed in the town of Marcellus at the residence of the appellant, or at some convenient place near her residence, or at some other place in said town as should be determined by the commissioner.

In pursuance of such order a commission was duly issued to said Brewster, directing him to inquire by the oath of a jury, whether the appellant was a lunatic with or without lucid intervals, by reason of which infirmity she was incapable of governing herself or managing her affairs or property, and if so, from what time such infirmity dated, and in what manner and how such infirmity had manifested itself, and whether, while in such condition, she had alienated any lands, and if so, to whom and after what manner.

Thereafter, and on the 23d day of February, 1888, the commismissioner, at the village of Marcellus, in said county, proceeded to execute said commission, and the matter was duly tried before said commissioner and a jury called and sworn in the manner required by law. The trial of said matter continued until March 8, 1888, when it was duly submitted to the jury which, having duly deliberated thereon, rendered its verdict by which it unanimously found that the appellant was sane. The jury was thereupon discharged by the commissioner without its having made, signed or delivered any inquisition.

Afterwards, and on the 12th day of March, 1888, upon a paper signed by the commissioner, which was called a report, and upon the affidavits of Abel C. Benedict and Truman K. Fuller, a motion was made in the Onondaga County Court to set aside the verdict or inquisition of the jury, and for a new trial in the County Court. That motion was granted, and the issues to be tried were thereupon settled, and were as follows:

"*First.* Whether Betsey Ann Mason, of the town of Spafford,

in the county of Onondaga, is a lunatic with or without lucid intervals, by reason of which infirmity she is incapable of governing herself or of managing her affairs or property, or properly caring for her lands, tenements, goods and chattels.

"*Second.* And if so, from what time such infirmity dates, and in what manner and how such infirmity has manifested itself.

"*Third.* And whether, while in such condition, the said Betsey Ann Mason has alienated any lands and tenements, or transferred any moneys, securities or personal property; and if so, to what person or persons, when, where and after what manner.

"*Fourth.* And also what lands, tenements, goods and chattels are remaining to her.

"*Fifth.* What is the value of the lands and tenements alienated by her; and what is the value of the lands and tenements, goods and chattels by her maintained; and what the issues and profits thereof amount to by the year; and what is the value of all her real and personal estate.

"*Sixth.* And who are the nearest heirs and next of kin of the said Betsey Ann Mason; and who would be entitled to her estate in case of her death, and the age of each."

The issues as thus settled were afterwards, and on the 6th day of February, 1889, brought to a hearing before a jury at a term of the County Court, held at the city of Syracuse, in and for the county of Onondaga. The jury rendered the following verdict:

"Q. Whether Betsey Ann Mason, of the town of Spafford, in the county of Onondaga, is a lunatic with or without lucid intervals, by reason of which infirmity she is incapable of governing herself or of managing her affairs or property, or properly caring for her lands, tenements, goods and chattels? A. Insane; without intervals. She is incapable by reason of infirmity caused by paralysis of July 11, 1887, to govern herself or manage her affairs, or properly care for her lands, tenements, goods and chattels. Q. And if so from what time such infirmity dates? A. July 11, 1887. Q. In what manner and how such infirmity has manifested itself? A. By a defective memory; delusion and alienated property. Q. And whether, while in such condition, the said Betsey Ann Mason has alienated any lands and tenements, or transferred any moneys, securities or personal property; and if so, to what person or persons, when, where

and after what manner? A. Yes; to Frank Callender; lands and tenements on September 17, 1887; her home in the town of Spafford, by deed; a mortgage of $5,000, and further we cannot say. Q. And also what lands, tenements, goods and chattels are remaining to her? A. Don't know. Q. What is the value of the lands and tenements alienated by her? A. Don't know. Q. What is the value of the lands and tenements, goods and chattels, by her maintained? A. Don't know. Q. What do the issues and profits thereof amount to by the year? A. Don't know. Q. What is the value of all her real and personal estate? A. Don't know. Q. And who are the nearest heirs and next of kin of the said Betsey Ann Mason; and who would be entitled to her estate in case of her death, and the age of each? A. Alanson Hicks, Walter Hicks and Mary Ann Callender."

On the rendition of the verdict the counsel for the appellant made a motion for a new trial upon the minutes of the trial court, upon the grounds stated in section 999 of the Code of Civil Procedure, and because the verdict was contrary to the evidence, and contrary to law and upon the exceptions. This motion was denied.

Afterwards, and on the 11th day of March, 1889, a judgment or final order was made and entered confirming the verdict of the jury and adjudging the appellant a lunatic, without lucid intervals, and incapable of governing herself and managing her estate or property in a proper manner, and appointing Frederick W. Barker committee of her estate upon his filing a bond, with sufficient sureties to be approved by that court, in the penal sum of $50,000, conditioned for the faithful performance of his duties as such committee in obedience to the order of the court. It was also further ordered that Mary Ann Callender be appointed a committee of the person of the appellant upon her executing and filing a bond, in the penal sum of $2,000, conditioned for the faithful performance of her duties as such committee, in obedience to the order of the court.

From this order or judgment, and from the order denying the appellant's motion for a new trial, she appealed to this court. A case and exceptions were settled, which contained all the evidence.

A motion was made by the respondent to dismiss the appeal in this case on the grounds: "1. That said appeal was brought by

George Barrow, as attorney, without legal authority to bring the same. 2. That said appeal was brought after an acquiescence on the part of George Barrow, Esq., in the validity of said proceedings, and in the appointment of a committee of the estate of said lunatic, as shown by the facts recited in the affidavits accompanying this notice of motion. 3. Upon the ground that an appeal is not the proper remedy to dispose of the committee and restore the estate of the lunatic to herself, but that the proper remedy is by application to the County Court for a writ of *supersedeas*, which writ has been heretofore brought and a hearing had thereon, and such application denied once. 4. That said appeal is not in the interest of said lunatic, but evidently, from the facts shown, in the interest of one Francis R. Callender, who has already acquired so large a portion of her estate, to wit, twenty-five thousand dollars and over. 5. That the same attorney should not be heard alleging in one proceeding the invalidity of the decree in lunacy and the appointment of a committee, while in other proceedings he acquiesces in and affirms the same. 6. And upon any other ground which arises legitimately from the papers upon which this motion is made." This motion was based upon the affidavits of Truman K. Fuller, the respondent's attorney, and A. Judd Northrup, the county judge before whom the action was tried. Affidavits of George Barrow and of the appellant were read in opposition thereto.

*M. M. Waters* and *George Barrow*, for the appellant.

*T. K. & L. E. Fuller*, for the respondent.

MARTIN, J. :

An examination of the papers read on the respondent's motion to dismiss this appeal, has led us to the conclusion that the motion should be denied, and that the appellant should be permitted to prosecute her appeal.

. This brings us to the consideration of the questions involved on the appeal from the order denying the appellant's motion for a new trial, and from the judgment confirming the verdict and appointing a committee of the person and estate of the appellant. The jury, by its verdict, found that the appellant was " Insane ; without intervals. She is incapable, by reason of infirmity caused by paralysis of July 11, 1887, to govern herself or manage her affairs,

or properly care for her lands, tenements, goods and chattels." It also found that such infirmity dated from July 11, 1887, and that it manifested itself " by a defective memory, delusion and alienated property."

The principal question decided by the jury was, whether the appellant was of unsound mind so that she was incapable of governing herself, or managing her property. The question was, whether she was so incompetent at the time of the trial. If it were admitted that, by reason of her sickness, which commenced July 11, 1887, she was for several days or weeks incapable of governing herself or managing her affairs, still, if, at the time of the trial, she had recovered, and her competency was so far restored that she was then able to govern herself and manage her business, she could not be adjudged a lunatic, or deprived of the management of herself, her property and her affairs.

A careful study of the evidence contained in the appeal-book seems to lead irresistibly to the conclusion that the proof was insufficient to justify the jury in finding that the appellant was at the time of the trial of unsound mind, and incapable of governing herself or managing her affairs and property. While it may be said that there was some evidence that soon after her attack of paralysis, and during the earlier days of her sickness, she manifested apparent delusions of mind, still the evidence demonstrates quite clearly that they were only the delusions or fancies of a sick-bed, and that they passed away as she improved in health and strength. Indeed, when the whole evidence upon the question of such alleged delusions is carefully considered, it is rendered quite doubtful if, even when her disease was at its height, there was any real or substantial delusion existing in the mind of the appellant. A delusion is a belief in a state or condition of things, the existence of which no rational person would believe. The evidence to show that the appellant at any time really believed any of the pretended delusions is very meagre, to say the least; but perhaps it was sufficient to justify the jury in finding that such delusions existed in the summer of 1887. There was, however, no evidence to show that she had a confirmed or continued belief in these delusions, if such they were. Her belief therein, if it ever existed, was only temporary, and passed away as she regained her health. We can find nothing in the evidence as to

these alleged delusions which was sufficient to justify a finding that the appellant was of unsound mind.

It is also said that the proof disclosed that her memory was defective, and that that was evidence of unsoundness of mind. The alleged defects of memory related to the times when certain occurrences transpired, and to a failure on her part to give correctly the details as to securities held by her, their amounts and the names of the persons against whom they existed. In some of the instances relied upon it is far from certain that the appellant was not correct, and those who testified to the contrary mistaken. In some of those instances the weight of evidence was to the effect that her statement was correct. Again, when we consider the uncertainty of the human memory, the fact that many persons of sound, and even of brilliant minds, have very defective memories, and when we consider the circumstances under which the most of the statements were made by the appellant, which were relied upon as showing the defect in her memory, we are not at all surprised that she was not able to give every incident of her life, or every incident of which she ever had knowledge, and all her business transactions with accuracy and in detail. Had she been able to do so, we should have regarded her as possessing a memory of very unusual strength. There was no proof of any change in the appellant in this respect. That she, prior to her sickness, had a more retentive memory, or a clearer recollection of the transactions inquired into, was not shown. The proof, at most, shows that, as to a few of the many matters stated by her, she was mistaken as to dates and events. We think her examination tends to show that she possessed at least an ordinarily accurate and clear memory of the things and events to which her attention was called. Nor can we believe that promptness and accuracy of statement are no evidence of a sound mind.

Again, it is claimed that the fact that the appellant transferred to her nephew her homestead, and canceled a mortgage for $5,000 which she held against his property, was evidence of unsoundness of mind. In determining whether this transaction was such evidence, it becomes necessary to consider the relations of the parties, the circumstances attending the transaction and the purposes of such transfer. At the time of these transfers the appellant was about sixty-four years of age. She was possessed of an estate of the value

of about fifty thousand dollars. The property transferred was of the value of about fifteen or twenty thousand dollars. She had no children. One had been born to her, but died in childhood. She had two brothers and a sister living. Her sister had an only son, who had lived near the appellant many years. He had been a daily visitor at her house since the death of her own child, and she had been very fond of him from his youth up. When he arrived at man's estate, and after the death of her husband, the appellant had leased him her farm on shares, and thus they had been members of the same household for several years. The evidence tended to show that he had been kind to her and treated her with the utmost consideration. Her husband, before his death, had often talked with her in relation to making provision for this nephew, and they had agreed that they would do well by him. After her attack of paralysis, and after she had substantially recovered from its effects, realizing the uncertainty of life, she began to consider the question of disposing of her property, and also of securing for herself a home where she would be cared for by the tender hands of friends. To accomplish this purpose, and to carry into effect the long-cherished plan of herself and her husband "to do well by this nephew," she transferred to him the homestead farm and canceled a mortgage she held against him. In consideration of this transfer and cancellation of mortgage he agreed to take care of her for the remainder of her life. To secure such care she took to herself a life lease of the farm. Under these circumstances, who can justly say that this transaction was evidence of an unsound mind? Surely there was nothing unusual in such a proceeding. What more natural than that the appellant should desire to provide for herself a home in the family of her favorite nephew; and what more natural than that she should amply reward him for such care by transferring to him a portion of her property, and thus carry out her own desires as well as those of her deceased husband.

But it is said that she did not have the agreement of her nephew to take care of her reduced to writing. That is true. But the papers were prepared by her lawyer, and the method of transacting this business was presumably left to him. He had a life lease given to her to secure her maintenance. That she was guided in the transaction of this business by the advice of her lawyer is not evi-

dence of mental incapacity. If such a transaction is to be regarded as evidence of unsoundness of mind, many a fond father and mother are liable to be involved in, and have their estates dissipated by, litigations similar to that imposed upon the appellant in this case. We cannot think a transfer of property, or surrender of a security, made under the circumstances shown by the proof in this case, any evidence of unsoundness of mind.

When we consider all these grounds together, and consider all the proof in the case bearing upon the question, we do not think they furnish sufficient evidence to justify a finding that the appellant was of unsound mind. We are, therefore, of the opinion that the evidence was insufficient to sustain the finding of the jury, and that the learned county judge erred in denying the appellant's motion for a new trial on that ground.

Our attention is also called to other errors which seem to require a reversal in this case. On the trial a physician, who was called as a witness for the petitioner, was permitted to testify, under the objection and exception of the appellant, that she had not sufficient mental strength to manage her estate or conduct the business connected with it. In *Matter of Arnold* (14 Hun, 525), where a physician was called as a witness and permitted to testify that the testator was not possessed of testamentary capacity, it was held error, and the decree was reversed. If it is not competent for an expert witness to testify to want of sufficient capacity to make a will, it must be incompetent for such a witness to testify to the absence of sufficient capacity to manage an estate. The principle of that case is decisive of the question. We think the evidence should have been excluded.

Abel C. Benedict was called as an expert witness by the petitioner. The appellant sought by cross-examination to show that the witness procured admission to the house where the appellant was living, so that he might become a witness, by fraudulent and improper means, without the consent and against the will of those there present, and in the absence of her attending physician, whom they desired to have present. This evidence was objected to by the petitioner and excluded by the court. Its purpose was to show the means adopted by Benedict to make himself a witness in the case. On the cross-examination of a witness the party should be allowed to show what-

ever may indicate the probable relations between the witness and the party, and whether they be friendly or unfriendly is always admissible for the purpose of affecting the degree of credit which his evidence should receive. (*Wallace* v. *Marks*, 13 W. Dig., 399.)

A witness may be asked any question tending to show that he is not impartial, and if he denies the facts suggested, he may be contradicted. (Stevens' Dig. of Ev., 186.) A witness may be required to explain whatever would show bias on his part. (1 Wharton on Ev., § 545.) We think this evidence should have been admitted, and that the appellant was entitled to show by the witness the facts sought to be proved as bearing upon the credit to be given his evidence.

Dr. Mercer was also called as an expert by the petitioner, and was permitted, under the appellant's objection and exception, to answer a hypothetical question, which was based partially upon facts which had been proved, partially upon assumed facts, as to which we find no proof, and partially upon portions of the testimony of other witnesses given on the trial which the witness had heard. We think the question was improper, and that the court erred in overruling the appellant's objection. "Hypothetical questions are allowed to be put to experts, but the hypothesis upon which they are examined must be based upon facts admitted or established by the evidence, or which, if controverted, the jury might legitimately find on weighing the evidence." (*People* v. *Augsbury*, 97 N. Y., 501.) "In such a case it is not the province of the witness to reconcile and draw inferences from the evidence of other witnesses, and to take in such facts as he thinks their evidence has established, or as he can recollect and carry in his mind, and thus form and express an opinion." (*Reynolds* v. *Robinson*, 64 N. Y., 589 ; *Guiterman* v. *Liverpool, etc., S. S. Co.*, 83 id., 358 ; *Hagadorn* v. *Conn. Mut. Life Ins. Co.*, 22 Hun, 249.)

Alanson Hicks, petitioner, who instituted this proceeding, was sworn as a witness. On his cross-examination he was asked by the appellant's counsel if he had not offered to settle this matter. This was objected to by the petitioner as immaterial and improper, and the court sustained the objection. The appellant then stated to the court that he desired to prove by the witness that he had offered to drop the case if the appellant would pay him $15,000. This was excluded and the appellant excepted. We think the evidence

offered should have been admitted. It would have tended to show that the petitioner's attitude was not as friendly, disinterested and philanthropic as it was described to the jury by the court in its charge. It would have shown his motive, and would have been some evidence that he did not regard the appellant as insane and incompetent to transact her business. It would have borne directly upon the credibility of his evidence.

While the appellant's counsel was cross-examining the petitioner's witness Mercer, and while, as appears from the appeal-book, he was confining himself to a legitimate and proper cross-examination, the court stopped him and refused to permit any further cross-examination. This action on the part of the court was excepted to by the appellant. While the cross-examination of a witness may be limited and kept within proper bounds, and the extent to which it may be pursued, especially as to collateral matters, is largely within the discretion of the court, yet the right to properly cross-examine a witness should always be accorded to a party. "The exercise of this right is justly regarded as one of the most efficacious tests which the law has devised for the discovery of truth. By means of it the situation of the witness with respect to the parties and to the subject of litigation, his interest, his motives, his inclination and prejudices, his character, his means of obtaining a correct and certain knowledge of the facts to which he bears testimony; the manner in which he has used those means, his powers of discernment, memory and description, are all fully investigated and ascertained, and submitted to the consideration of the jury, who have an opportunity of observing his demeanor and of determining the just value of his testimony." (2 Taylor on Ev., § 1428.) In this case we think the court improperly deprived the appellant of the benefit of a full cross-examination.

On the trial the petitioner's counsel was permitted to read from medical works what different authors had written in relation to the condition of a patient when the arm regained its power quicker and better than the leg, and then to ask the witness the following question: "Assuming the facts stated there, what do you think as to the proposition that that is a bad indication?" To which the witness answered: "It is an unfavorable condition as compared to the reverse when the limb mends first and the arm last; the condition

is more favorable; more favorable as to the condition of the brain, and shows a less degree of disorganization of the brain."

The petitioner's counsel was permitted to read in the presence of the jury several extracts from the works of different medical authors and then asked the witness similar questions. All this evidence was objected to, and the counsel for the appellant repeatedly asked the court to strike out what was read from the books, which was denied. We think this was error. It was, in effect, asking the witness to answer a question not based upon any hypothesis founded upon facts proved in the case, but to answer a question based upon the hypothesis that the statements read were true. The effect of these rulings was to bring before the jury the unverified statements of the authors of the books read, and would tend to improperly influence a jury in the determination of the question before them. Medical books cannot be introduced in evidence, nor can an expert witness be permitted to testify to statements made therein; and it is equally improper to permit the reading of such books to the jury by counsel. (*Boyle* v. *State*, 57 Wis., 472; *Stilling* v. *Town of Thorp*, 54 id., 528; *Harris* v. *Panama R. R. Co.*, 3 Bosw., 7; *Roe* v. *Strong*, 107 N. Y., 350; *Ashworth* v. *Kittridge*, 12 Cush., 193; *Com.* v. *Sturtivant*, 117 Mass., 123; *Collier* v. *Simpson*, 5 Car. & P., 73; *Fowler* v. *Lewis*, 25 Tex., 380; *State* v. *O'Brien*, 7 R. I., 336; *Davis* v. *State*, 38 Md., 15; *Com.* v. *Brown*, 121 Mass., 69.)

There are many other grounds of alleged error to which our attention has been called, embracing irregularities of procedure as well as errors in rulings, but the view taken of the questions already considered renders it unnecessary to especially examine the many other grave exceptions in the case.

Because of the errors already pointed out, we are of the opinion that the order denying the appellant's motion for a new trial, and the judgment or order confirming the verdict, and appointing a committee of the person and property of the appellant should be reversed.

HARDIN, P. J., concurred; MERWIN, J., concurred in the result.

Motion to dismiss the appeal denied, with ten dollars costs and disbursements; judgment or final order and order denying new trial reversed and a new trial granted, with costs of this appeal to abide the final award of costs in this proceeding.