J. E. BIXBY v. THE OMAHA & COUNCIL BLUFFS RAILWAY AND BRIDGE COMPANY, Appellant.

**Evidence:** MEDICAL BOOKS. Medical works are not admissible under 3 Code, section 4618, making historical works and books of science

105 293
a109 201

105 293
f 110 530
f 110 651

105 293
113 115
105 293
123 351

105 293
127 443

105 293
d132 229

105 293
142 114

or art presumptive evidence of facts of general notoriety or interest therein stated.

SAME. Medical books, although admitted to be standard, cannot be read to the jury for the purpose of proving the symptoms of disease, where they have not been referred to by witnesses whom they are offered to contradict.

*Appeal from Pottawattamie District Court.*—HON. N. W. MACY, Judge.

TUESDAY, MAY 10, 1898.

ACTION for damages occasioned by the negligence of defendant. Trial to jury, verdict and judgment for plaintiff, and defendant appeals.—*Reversed.*

*Wright & Baldwin* for appellant.

*Harl & McCabe* for appellee.

LADD, J.—This action is brought for injuries sustained by the plaintiff in a collision between a street car of the defendant and a train on the Chicago, Burlington & Quincy Railroad. The liability of the defendant appears to have been conceded at the trial, and the extent of the injury and the amount to be allowed as damages were the only questions in controversy. There was some contusion of the skin and bruises, but these soon disappeared, and at the time of the trial, there was no objective or external evidence of any injury. The theory of the plaintiff was that he had received a serious shock to his nervous system, and had symptoms indicating locomotar ataxia or some neurotic trouble. Dr. Barstow testified to such symptoms, while Drs. Jennings, Lacey, and Thomas insisted that there existed no signs of any disease. The plaintiff was permitted, over the objection of the defendant, to read in

evidence extracts from "Pepper's System of Medicine," Vol. 5, under the heads, "Tabes Dorsalis, Locomotor Ataxia," "Morbid Anatomy," and "Physiology"; from a work by Dr. Ranney, under the heads "Nerve Cells and Nerve Fibers,' "Spinal Neurasthenia"; from a work by Dr. Hirt, entitled "Diseases of the General Nervous System," under the heads "Functional Neurosis," "Diseases of the Pneumogastric Nerve," and "Affections of the Air Passage Due to the Lesions of the Vagus"; also extracts from a lecture by S. Weir Mitchell on "Permanent Headache"; and from a lecture by Dr. H. B. Wood on "The Remote Effects of Traumatism, as Seen by the Neurologist." These works were admitted to be standard, but had not been quoted or cited as authorities by the physicians in giving their testimony. The portions read to the jury treated of the symptoms, and not the cure, of diseases, and might be fairly well understood by those somewhat acquainted with the nomenclature of the medical profession. These extracts cover twenty-four pages of the abstract, and it is impractical to set them out. While they might aid the educated physician to a better understanding of the matters discussed, we are satisfied their tendency was to mislead and confuse the jury. A person of ordinary comprehension could not understand much of the language used, and would be in great danger of being misled by the grouping of symptoms. The learning of these works, if extracted by a skilled physician and applied to the particular case, and thus brought within the comprehension of the jurors, would doubtless have been of great assistance in ascertaining the true condition of the plaintiff. But as they assume a technical knowledge on the part of the reader, and capacity to understand the relative importance to be attached to symptoms, we think they could not be safely left to their interpretation and inferences. As

said by Chief Justice Shaw in *Ashworth v. Kittridge*, 12 Cush. 193 (59 Am. Dec., 178): "Medical science has its own nomenclature, its technical terms and words of art, and also common words used in a peculiar manner, distinct from their received meaning in the general use of the language. From these and other causes, a person not versed in medical literature, though having a good knowledge of the English language, would be in danger, without an interpreter, of misapprehending the true meaning of the author; whereas, a medical witness would not only give the fact of his opinion and the grounds on which it is formed, with the sanction of his oath, but would also state and explain it in the language intelligible to men of common experience." The question is not whether the courts will use the helps of science in the investigation of truth. There is no controversy on that score. The authorities are agreed that the truths of the exact sciences, the established facts of history, and computations from fixed data may be proven by the works of reputable authors. *Worden v. Railway Co.*, 76 Iowa, 310; *Gorman v. Railway Co.*, 78 Iowa, 509; *Scagel v. Railway Co.*, 83 Iowa, 380; *Schell v. Plumb*, 55 N. Y. 598; *Mills v. Catlin*, 22 Vt. 98. This is on the ground that all men assent to their correctness. But medicine belongs to the class known as inductive sciences. The data is constantly shifting with new discoveries, and the conclusion which may be considered sound to-day is repudiated tomorrow. A medical work may be standard this year and obsolete next. The opinion of the same author changes in the different editions, owing to new discoveries and a better understanding of symptoms. The very best works, aside from observations, are largely made up of the opinions either of the author or of others compiled. It is a well-known fact that physicians after research and investigation often differ radically.

It was said in *Clark v. State*, 12 Ohio, 483 (40 Am. Dec.481), where the sanity of the defendant was involved, that "whenever they have enlisted on the side of either party, or of some favorite theory, and one portion of the profession is placed in array against another, the difficulties mentioned in the passage above quoted are greatly multiplied, and, however honest or renowned for professional character the witnesses may be, such will be the conflict of their testimony, in nine cases out of ten, that it will be utterly unsafe for a jury or court to follow or adopt the conclusions of either side." If those learned in medicine are often unable to determine from the books the nature and extent of injuries and diseases, how shall the laymen be better informed by an examination of them ?    The situation emphasizes the necessity of cross-examination and the use of an oath, not only that the theory contained in the books may be known and understood, but that practical skill may apply the science of medicine to each case.    As said, not the use of the inductive sciences in the investigation of truths, but the manner—the vehicle, as it were —by which the results of research shall be conveyed to the court and jury is involved.    We think the safer practice is to rely upon the testimony of living witnesses of the medical profession, who may bring the learning and reasearch of the books within the comprehension of the jurors, and the truths of science to the facts in each particular case.    Indeed, the advocates of a contrary rule generally admit the necessity of additional safeguards, which may only be provided by legislation.    See article by John Henry Wigmore in 26 American Law Review, 390.    The language of the supreme court of Michigan in *People v. Hall*, 48 Mich. 482 (12 N. W. Rep. 665), is so pertinent that we quote it with approval: "Scientific or expert testimony must be given by living witnesses who can be cross-examined

concerning their means of knowledge, and can explain in language open to general comprehension what is necessary for the jury to know. The only legal reason for allowing the evidence of opinions is found in the presumption that an ordinary juryman or other person without special knowledge could not understand the bearing of facts that need interpretation. Medical books are not addressed to common readers, but require particular knowledge to understand them. Every one knows the inability of ordinary persons to understand or discriminate between symptoms or groups of symptoms, which cannot always be described to those who have not seen them, and which, with slight changes and combinations, mean something very different from what they mean in other cases. The cases must be very rare in which any but an educated physician could understand detached passages at all, or know how much credit was due to either the author in general or to particular parts of his book. If jurors could be safely trusted with the interpretation of such books, it is hard to see on what principles witnesses would be required. Scientific men are supposed to be able, by their study and experience, to give the general results accepted by the scientific world, and the extent of their knowledge is tested by their personal examination. But the continued changes of view brought about by new discoveries in most matters of science, and the necessary assumptions by scientific writers of some technical knowledge in their readers, render the use of such works before juries—especially in detached portions and selected passages—not only misleading, but dangerous. The weight of authority, as well as of reason, is against their reception." The exclusion of such evidence is approved on substantially the same grounds by the following among many authorities: *Johnston v. Railroad Co.*, 95 Ga. 685 (22 S. E. Rep. 694); *Fowler*

*v. Lewis*, 25 Tex. Supp. 380; *Melvin v. Easley* 46 N.
C. 386; *State v. O'Brien*, 7 R. I. 336; *Epps v. State*, 102;
Ind. 539 (1 N. E. Rep. 491); *Boyle v. State*, 57 Wis. 472
(15 N. W. Rep. 827); *Reg. v. Taylor*, 13 Cox. Cr. Cas. 77;
*Ware v. Ware*, 8 Me. 42; *Tucker v. Donald*, 60 Miss. 460;
*Ordway v. Haynes*, 50 N. H. 159; *Huffman v. Click*, 77
N. C. 55; *Payson v. Everett*, 12 Minn. 217 (Gil. 137);
*Collier v. Simpson*, 5 Car. & P. 73; *Harris v. Railroad
Co.* 3 Bosw. (N. Y.,) 7.

Our conclusion is somewhat opposed to language
contained in *Bowman v. Woods*, 1 G. Greene, 441. In
that case a physician was sued for malpractice in an
accouchement case, and in defense set up that he had
followed the botanic system of practicing medicine. It
appears the plaintiff so knew in employing the defend-
ant, and physicians were called to show that his treat-
ment was in accordance with that system. They
referred to certain standard works on botanic medi-
cine, from which they claimed to have derived much of
their professional knowledge. Such books were held
admissible. If a physician is employed to treat a
patient according to a certain system, and he does so,
exercising ordinary skill therein, he has fulfilled his
obligation. Now, in determining whether he has in
fact followed that system, the books from which physi-
cians of that school are shown to have derived their
knowledge may be admissible, for these expound the
very principles which he is alleged to have violated;
and certainly, under such circumstances, the books
themselves would be better evidence than quotations
from them. In such a case a physician might refer to
an author as justifying his conclusion that the treat-
ment was or was not in accordance with his system,
and as said in this case: "Being permitted to refer to
and quote authors, we can see no good reason why they
may not read the views and opinions of distinguished

authors. The opinions of an author, as contained in
his works, we regard as better evidence than the mere
statement of those opinions by a witness, who testified
as to his recollection of them." The reasoning does
not apply to a case where the school or system is not
involved; for it is not the rule to permit the physician
to quote from medical works. See *Boyle v. State,* 57 Wis.
472 (15 N. W. Rep. 827); *Com. v. Sturtivant,* 117 Mass.
122; *Ashworth v. Kittridge, supra; Marshall v. Brown,* 50
Mich. 148 (15 N. W. Rep. 85); *People v. Wheeler,* 60 Cal.
581 (44 Am. St. Rep. 70); *Collier v. Simpson, supra.*
2        It seems, however, that, where the witness has
referred to some medical authority to sustain the
opinion he has expressed, that authority may be intro-
duced in evidence for the purpose of contradicting him.
*Pinney v. Cahill,* 48 Mich. 584 (12 N. W. Rep. 862); *City
of Ripon v. Bittel,* 30 Wis. 619; *City of Bloomington v.
Shrock,* 110 Ill. 219. See, contra, *Davis v. State,* 38 Md.
15. In *State v. Howard,* 10 Iowa, 101, the only point
decided is that a medical work cannot be taken to a
jury room. In *Donaldson v. Railway Co.,* 18 Iowa, 280,
the Carlisle tables are admitted on the strength of the
ruling in *Bowman's Case.* In *Brodhead v. Wiltse,* 35
Iowa, 429, it is held that section 4618 of the Code,
adopted after the decision in the *Bowman Case,* was not
restrictive in its effect, and rendered no evidence inad-
missible which was admissible before, and that stand-
ard medical authorities are not the best evidence of
what they teach, as was intimated in *Bowman's Case.*
In *Quackenbush v. Railway Co.,* 73 Iowa, 458, the objec-
tion to the extract offered was that it was too indefi-
nite, and this was overruled. In *Peck v. Hutchinson,*
88 Iowa, 320, the objection was simply that the medical
work offered was an old edition, and its introduction
was held to be without prejudice. We do not think
*Bowman's Case* decisive of the question now before us,

and certainly no other can be so construed. In Alabama alone are medical works received in evidence. *Stoudenmeier v. Williamson,* 29 Ala. 558, followed in the subsequent cases of *Merkle v. State,* 37 Ala. 139, and *Bales v. State,* 63 Ala. 30. In the first of the above the issue involved the breach of warranty in the sale of a slave. That the objections to the admissibility of such evidence are not answered is evident from the following quotation, which is not inconsistent with the rule we adopt: "The brief period of human life will not allow one man, from actual observation and experience, to acquire a complete knowledge of the human system and its diseases. Professional knowledge is in a great degree derived from the books of the particular profession. In every step the practitioner takes, he is, perhaps, somewhat guided by the opinions of his predecessors. His own scientific knowledge is, from the necessities of the case, materially formed and molded by the experience and learning of others. Indeed, much of the knowledge we have upon all subjects, except objects of sense, is derived from books and our associations with men. It is the boast of this age of advancing civilization that, aided and facilitated by the printer's art, the collected learning of past ages has been transmitted to us. Shall we withhold the benefits of this heritage from the contests of the court room? We think not."

The appellee insists these treatises were admissible under section 4618 of the Code, which is as follows: "Historical works, books of science or art, and published maps or charts, when made by persons indifferent between the parties, are presumptive evidence of facts of general notoriety or interest therein stated." As said in *Broadhead v. Wiltse, supra,* the purpose of the legislature was to extend the rule of evidence rather than to restrict it. This extension is

limited, however, by the words, "facts of general notoriety or interest therein stated." The supreme court of California in construing a statute identical with ours, except the last two words are omitted, used this language: "What are facts of general notoriety and interest? We think the terms stand for facts of a public nature, either at home or abroad, not existing in the memory of men, as contradistinguished from facts of a private nature, existing within the knowledge of living men, and as to which they may be examined as witnesses. It is of such public facts, including historical facts, facts of the exact sciences, and of literature or art, when relevant to a cause, that, under the provisions of the Code, proof may be made by the production of books of standard authority. * * * Such facts include the meaning of words and allusions which may be proved by ordinary dictionaries and authenticated books of general literary history, and facts in the exact sciences, founded upon conclusions reached from certain and constant data, by processes too intricate to be elucidated by witnesses when on examination." *Gallagher v. Railway Co.*, 67 Cal. 13 (6 Pac. Rep. 869). We think this the correct interpretation of this section, and that it does not authorize the admission of medical treatises. This identical question was before the United States circuit court of appeals for this circuit in *Railway Co. v. Yates*, 25 C. C. A. 103 (79 Fed. Rep. 584), and in a clear and exhaustive opinion a like conclusion was reached. See, also, *Van Skike v. Potter*, (Neb.) (73 N. W. Rep. 295). The exceptions to the other rulings on the admissibility of evidence are without merit. The other errors assigned are not likely to arise upon another trial—REVERSED.