Jessie F. Jakes, Plaintiff in Error,

*v.*

Union Carbide Nuclear Company et al., Defendants in Error.

(*Nashville,* December Term, 1959.)

Opinion filed April 6, 1960.

Stockell, Rutherford & Crockett, Nashville, for plaintiff in error.

DENNEY, LEFTWICH & OSBORN, Nashville, for defendants in error.

MR. JUSTICE SWEPSTON delivered the opinion of the Court.

Mrs. Jessie F. Jakes brought her action for compensation in accordance with T.C.A. sec. 50-901 et seq., the Tennessee Workmen's Compensation statute, to recover for the death of her husband, Glenn Jackson Jakes, Sr., on March 25, 1959, while he was an employee of the Union Carbide Nuclear Company at Oak Ridge, Tennessee.

The petition alleged that deceased suffered a heart attack resulting from strain, effort and exertion in the work he was doing for the defendant in error, hereinafter called the Company. The answer denied that the death resulted from an accident growing out of and in the course of his employment. The trial judge found in favor of the Company and dismissed the suit. Hence this appeal.

The two assignments of error are (1) that the court erred in finding that the death did not occur out of and in the course of the decedent's employment; and (2) there is no evidence to support the judgment of the court in so holding.

■ It is hardly necessary to reiterate the oft-stated rule that, insofar as the facts and the reasonable inferences from the proven facts are concerned, our review is limited to the question of whether or not there is any material evidence to support the judgment of the trial court.

The deceased employee had worked for this Company at Oak Ridge constantly for 8 years immediately preceding his death. He was 62 years of age at the time of his death and same was brought about as the result of a coronary thrombosis. Neither the deceased nor any one else was aware of the fact that he had a heart condition and the same was definitely established only as a result of an autopsy made several months following his death.

Ordinarily he worked 5 days or 40 hours a week but on occasions put in overtime and was shown to have worked 16 hours overtime in one week two weeks before his death. His home was in Nashville and he and the Chief Supervisor for the Company, Mr. Anderson, would return to Nashville on Saturday of each week, spend the night with their families and return on Sunday to Oak Ridge.

On the morning of the day on which he died, Mr. Anderson picked him up at his home 12 miles from the plant of the Company at 7:15; he told Mr. Anderson that he had been suffering since 3:00 o'clock that morning with indigestion and did not feel well but that as he had only 2 days to go before his vacation started he would try to work those 2 days. They arrived at the plant a few minutes before 8:00 o'clock. The work day began at 8:00 o'clock and it appears that the decedent punched the time clock a few minutes before 8:00.

The evidence supports the conclusion, however, rather clearly that the deceased did not engage in any of his regular duties on this morning. He was under the impression that he had indigestion. He went to the first aid station and told the nurse that he needed something for a cold and also something for his indigestion. When he returned to the area of his usual station he lay down on this work bench and shortly thereafter fainted. An ambulance was called and he was taken to the Company hospital about 10:30 and shortly thereafter he died.

His work consisted of that of a precision machinist operating one of 18 machines in this area. The course of conduct and activity of the decedent on that morning is shown in the testimony of a fellow machinist, Eugene S. Vaughn, who testified as follows:

"Cross-Examination

"By Mr. Rutherford:

"Q. Mr. Vaughan, what time did you come to work that morning? A. Well, it was about five minutes until eight o'clock.

"Q. Do you know what time Mr. Jakes came to work? A. Well, he was there when I got there.

"Q. Do you punch a time clock when you come in? A. Yes, sir.

"Q. In other words, he had already punched his and was at his bench when you got there? A. Yes, sir.

"Q. Well, at the lathe? A. No. Where I saw him was back at my machine.

"Q. About what time did you get there that morning? A. About five minutes till eight.

"Q. You don't know what he had done before you got there? A. No. This is the first time I had seen him that morning.

"Q. What did he do after you got there? A. Well, we had a little talk that morning.

"Q. Did you sometimes have talks while you were on the job? A. Well, as I said, it was five minutes until eight. Of course, we did have a short talk in five minutes.

"Q. Well, I don't know whether you followed my question or not? A. Yes, sir, sometimes. Our work is allied so that we do have talks.

"Q. There is no reason not to have talks on occasions and confer—your stations are right next to each other? A. Right.

"Q. In other words you had punched in before eight o'clock, hadn't you? A. Yes.

"Q. Both of you, because you were already there five minutes of eight and he had gotten there ahead of you. Now, what were you talking about, about your work just generally? A. Well, what started it, he stopped by there and I had some pictures of my son (omit non-essentials). And he also told me about his condition that morning at 3:00 o'clock when he awoke.

"Q. Did he tell you his vacation started after that week? A. Yes sir. He had been talking about that for 3 weeks.

"Q. Well, how long was it before he left to go to the first aid station? A. Well, it was within fifteen minutes.

"Q. What was he, what did he have on his lathe at that time? A. He had a fixture that we use to hold tubing that he was putting this bevel on.

"Q. Will you repeat that answer? A. He had a fixture on this lathe that holds tubing that he was putting this bevel on.

"Q. What did he do to that pipe that morning? Did he run his machine? A. No, sir.

"Q. In other words, after you talked, he did not run his machine? A. No sir.

"Q. Did he adjust his machine? A. He might have made a minor adjustment. I couldn't say about that.

"Q. How old are you, Mr. Vaughn? A. 33.

"Q. That work to you is easy work, I take it? A. This particular bevelling job?

"Q. No, your general work. Is your work the same as Mr. Jakes?"

Again:

"Q. Mr. Vaughn, you didn't—I didn't understand you to say that Mr. Jakes had not done anything that day, did I? A. You asked me if he had bevelled any of that pipe, I think maybe.

"The Court: He asked you if he had started his machine and you answered no. You said he may have made some minor adjustments.

"By Mr. Rutherford:

"Q. Well, don't you know he had put pieces of pipe in the machine—he wouldn't have left that overnight? A. It is not unlikely at all.

"Q. You mean it is customary to go off when quitting time comes and leave a pipe on a machine? A. Yes, sir, it is not uncommon at all.

"Q. What about in this case? A. Well, like I say, it is not uncommon at all, but—

"Q. Do you know whether he had or not

"The Court: Let him finish.

"A. He hadn't put any in that morning.

"Q. Do you know whether he had made any adjustment or not you said he may have made one? A. I said he may have made a minor adjustment such as touching a button or starting the engine.

"Q. But he hadn't done anything more than that? A. No.

"Q. And you don't know what he did before he got there? A. No sir."

The witness then stated that he observed the deceased after the work hour began and that the deceased was walking about in and out of the building talking to various machinists there and he further testified as follows:

"Q. Well, do you mean to say that he didn't do any work then? A. Well, he didn't—I wouldn't call it work.

"Q. I didn't ask you what you would call it just tell us what he did? He walked around and talked to the machinists and what else, did he adjust any machine? A. I wouldn't say that he did.

"Q. And you wouldn't say that he didn't? A. I wouldn't say he didn't but—

"Q. But—

"The Court: Wait a minute.

"A. —A chuck has to be turned. There is a leverage place to start your chuck in rotation before you peel that metal off and it hadn't turned that morning.

"Q. What is necessary before turns? A. You press a button and start the engine, or if the switch is off you have to turn the switch on.

"Q. Well, are you starting at the beginning. Don't you have to put something in the machine first? A. This particular morning it was already in there.

"Q. Whether it is in there or not, it is necessary for it to be put in there? A. It is necessary for it to be in there.

"Q. And it has to be put there? A. Yes sir.

"Q. Don't you have to adjust something or tighten something, adjust some screws before you can turn anything? A. If it is not already done, you do.

"Q. All right. You put it in there and it has to be secured doesn't it? A. Right.

"Q. Do you have to take any measurements or set the machine to make it cut the way you want it to. Does that have to be done? A. That's right.

"Q. And then is there anything else to be done before you press the button and start the motor. Do you have to take any measurements? A. Well, yes, you have to take measurements at various times.

"Q. If you don't you will cut a piece of pipe that you can't use, won't you? Or whatever you are cutting or bevelling? A. Yes sir.

"Q. So it is necessary to take measurements? A. Yes sir.

"Q. Now, you have to find out what the measurement is for, or what type of material you are cutting for, so you will know how to make those measurements, don't you? A. Well, we are usually given the dimensions.

"Q. Do you have some sort of blueprint, or what do you call the thing that you are given? A. Well, you might have a sketch on that particular job.

"Q. That is furnished isn't it? A. Yes sir."

Parenthetically it may be observed that there is no contradictory testimony to the foregoing. The reasons for the above copious quotations will appear from the following. The attorneys for the plaintiff in error place stress on the testimony of Dr. W. J. Core, an experienced pathologist who has participated in a great many autopsies and is the medical examiner for Davidson County and the Coroner's physician. It will be observed that the questions and answers in his examination were predicated on the assumption that the decedent was engaged in work that morning. He was asked:

"Q. Well, if Mr. Jakes was in the condition indicated by this autopsy and was complaining with this pain in the chest and went to work in that condition, although he indicated that he did not feel up to it, capable of it, state what would be the probable effect of *working in that condition as a machinist?* (Emphasis supplied.) A. Well, any excitement, any worry, any exertion, is prone to bring these attacks on. However, from the history we get from the indigestion, etc., he had the

beginning of the attack during the night before he went to work.

"Q. Well, in that condition— A. It would aggravate it.

"Q. —What effect on the precipitation— A. It would aggravate that condition and make it more severe.

"Q. Make it more severe? A. Yes sir.

"Q. Would it in that way contribute to the final result? A. It would.

"Cross-Examination

"By Mr. Osborne:

"Q. After that heart attack, then, Doctor, anything he did outside of going to the hospital would probably have affected it, wouldn't it? A. He had no business doing any work in that condition."

Then again on re-direct-examination by counsel for plaintiff in error he was asked as follows:

"Q. Now, if this man was suffering from this condition which you described to his heart, was it dangerous for him to work? A. If that work consisted of worry, excitement or physical exertion.

"Q. Would you consider it beneficial for him to work as a precision machinist and an ordinary job? A. I am not familiar with that occupation, sir. I don't know how much mental anxiety or how much effort it requires, sir. I would say that if it occupied a man mentally without tiring him physically, it would not be detrimental for him to follow that after the attack, not

during the attack. During the attack, they want absolute rest.

"Q. Would you have prescribed for this man during his attack working at his usual occupation? A. No sir, I would not. I would prescribe hospitalization and oxygen and absolute rest.

"Q. And was *working* under these conditions while that attack was in progress—would that be detrimental to him? A. Yes, detrimental and dangerous."

Dr. Bruce Bellomy, pathologist, performed the autopsy on the deceased. His deposition was taken in behalf of the defendants. On cross-examination by counsel for the plaintiff in error, the following occurred:

"Q. The doctor, after stating that it is possible that a coronary thrombosis could arise from heavy work or mental strain, stated that an attack could occur during a workman's ordinary activity."

He was then asked and answered as follows:

"Q. So you would advise a man if his condition was as is you have discovered it was, to restrain from mental effort, or heavy physical work, would you not? A. I would have to say that I am really not qualified to answer that question because you have to individualize the treatment for each patient, and you have to consider factors such as how heavy his work is, or what his actual coronary function is, and I know nothing about this of this particular man; I don't think I could really answer it accurately."

Again on re-direct examination he was asked and answered as follows:

"Q. May I ask that you explain what you mean by the fact that this man's heart attack could have arisen out of his ordinary activities, do you mean this could have been had by Mr. Jakes in the absence of any physical exertion or mental or emotional stress? A. Yes sir, that is exactly what I mean. He or rather his coronary arteries were in such condition that he was liable to sudden death at any time, and we wouldn't have to postulate that he was doing something unusual, he might have sat down to dinner and died, for example."

The third pathologist who testified was Dr. Lawrence Grossman, who examined the report of the autopsy. He testified that heart attacks of this kind occur more commonly while the individual is at rest but in some cases it is precipitated by violent exercise or exhaustion. He was asked whether a moderate amount of physical exercise tends to produce a thrombosis or complete occlusion to which he answered, "No, I do not think so."

He then further stated that the majority opinion now is that a moderate amount of activity for such an individual is good but that a complete sedentary type of life is the wrong medical prescription.

Then he was asked:

"Q. This man operated a lathe in connection with which he would place length of metal pipe weighing as much as a pound or two on a lathe and then, he would turn on a switch and let the lathe bevel the edge of these pipes? A. I should certainly think he could do that.

"Q. Would that aggravate this heart condition, that type of work? A. I don't think so.

"Q. Would that precipitate the fatal heart attack, that sort of work? A. It definitely would not."

This physician further said that such heart attacks as these may be fatal or may not be, that prompt medical attention as soon as the attack begins is proper and may prolong life but on the other hand a patient may still have expired even if he be in the hospital under an oxygen tent within 20 minutes of the time such heart attack occurs.

■■ From the foregoing, it clearly appears that the judgment of the trial court is fully supported by this record. He was justified in concluding that this deceased employee did no work on this morning, nor did he engage in any strenuous activity, nor was he subjected to any condition about the premises of his employer that would establish any causal connection between the death and his employment. The answers of Dr. Core are predicated on the false assumption that the man was doing some of his ordinary work, hence his testimony is of no probative value nor is there any other medical testimony of any value under the circumstances in this case so far as showing a causal connection. It, therefore, seems that this case falls squarely within *Wilhart v. L. A. Warlick Const. Co.,* 195 Tenn. 344, and if anything, it is an even stronger case on the factual record. The burden is on one seeking compensation to show a causal connection between the employment and the death. *Idem.*

The writer of this opinion was interested in reading one or two cases located by his research. In *General Motors Corporation v. Hall,* 1956, 93 Ga.App. 181, 91

S.E.2d 57, compensation was allowed by reason of a heart attack on the premises precipitated by climbing 24 stairs on the premises on the way to the work position of the employee, although he had had an attack at home 4 hours before. There was also medical proof to sustain the finding.

Also in *United States Fidelity & Guaranty Co. v. Rosser,* 1956, 93 Ga.App. 201, 91 S.E.2d 64, compensation was allowed where the employee suffered a cerebral hemorrhage after he had been at work 4 hours and had stopped to get a drink of water.

In *Southern Engineering & Electric Co. v. Chester,* 1955, 226 Miss. 136, 83 So.2d 811, 84 So.2d 535, the employee had already suffered a heart attack and complained of chest pain on the way to work. He had been at work an hour before he climbed an 11 foot scaffold to another work position. He had to descend and died in about 30 minutes thereafter. There was a conflict in the medical testimony, two doctors testifying on each side contrariwise.

It is observed, however, in all 3 of those cases the fact is that the man was engaged in his ordinary work activities at the time the fatal attack occurred.

*Coleman v. Coker,* 204 Tenn. 310, 321 S.W.2d 540 and cases cited therein on page 541, are distinguishable on the same fact.

The judgment below is affirmed.