39585. UNITED STATES CASUALTY COMPANY et al. v. THOMAS et al.

DECIDED JULY 3, 1962—REHEARING DENIED JULY 27, 1962.

444

*Woodruff, Latimer, Savell, Lane & Williams, John M. Williams,* for plaintiffs in error.

*Clyde W. Henley, Leon S. Epstein,* contra.

EBERHARDT, Judge. Dean Harold F. McNiece,[2] writing in the February, 1961, issue of the Journal of Occupational Medicine asserts: "There has been far too much generalizing about the heart cases and too little examination into the specific factors which combine to produce the decisions in such cases." One of the factors is that the compensation board and the courts have dealt with them as if every heart condition were the same, having the same causative and precipitating factors. Heart cases have often been dealt with and decided in an empirical manner, reaching results that can not be sustained by facts established through years of study and research by those who are expert in this scientific area and upon whose judgment we must and do rely for the treatment of the many heart conditions and diseases to which the human body is subject. A casual study of medical

---

[2] St. Johns Univ. Law School—Prof. McNiece worked with a group of attorneys and cardiologists on a project sponsored by the National Heart Institute of the U.S.P.H.S. to determine "The Legal Basis for Awards in Cardiac Cases." He is the author of a book, "Heart Disease and the Law," widely read and accepted in medical and legal circles, and having the approval of Dr. Paul Dudley White, the noted Boston cardiologist who treated President Eisenhower.

literature dealing with the heart and circulatory system must disclose to the reader that all "heart attacks" are not the same, do not have the same causative or precipitating factors, do not occur under the same conditions, and are not treated in the same manner.[3]

This is a fact well known to the cardiologist, but not to the layman having little knowledge in that field of science, so that often what he thinks he does know is far from the scientific truth of the matter, is inaccurate, undependable and a poor guide or basis upon which to make an award or render a decision.

Likewise, what is or is not the causative or the precipitating factor in a given case, as here, is a scientific fact.

We are not confronted here with the question of whether a layman without training or experience is competent to testify relative to matters that are scientific. There was *no* lay testimony here as to whether there was or was not a causal relation between Thomas' exertion in driving the truck and handling two bundles of newspapers, all in the normal, usual and ordinary course of his daily work and without any slipping, dropping or jerking of the papers or any unusual occurrence in the driving of the truck, and his coronary occlusion.[4] There was only the testimony of the three physicians, two of whom had attended and treated him as his own physician, and the other of whom is on the faculty of the School of Medicine at Emory University. Their

---

[3]See, along with others, the references listed in footnote 1.

[4]It has been held many times that it is immaterial that the physical exertion engaged in by an employee is not unusual or excessive, and that the employer did not know about the employee's diseased condition. *Lumbermen's Mut. Cas. Co. v. Griggs,* 190 Ga. 277 (9 SE2d 84); *Williams v. Maryland Cas. Co.,* 67 Ga. App. 649 (21 SE2d 478); *Bussey v. Globe Ind. Co.,* 81 Ga. App. 401, 404 (59 SE2d 34); *Glens Falls Ind. Co. v. Gargal,* 97 Ga. App. 573 (103 SE2d 643); *Crawford W. Long Hosp. v. Mitchell,* 100 Ga. App. 276, 278 (111 SE2d 120). But it may be seriously questioned whether these cases were decided in the light of scientific views developed by the recent years of study and research.

testimony was in accord—that the deceased's exertion had played no part in precipitating the occlusion.

True enough, the exertion of driving the truck and handling the papers was *coincidental* with the appearance or manifestation of his heart disease, yet there was no evidence of any *causal* relation.

Despite the liberality of the act and the liberal construction which we must give it, it does not provide for compensation unless the disabling injury flows from the employment, just as effect from cause. The mere fact that an injury is contemporaneous or coincidental with employment is not enough. It must appear from some competent evidence that there was a *causal* relation between the two. "To hold otherwise would . . . make of the Acts something in the nature of life insurance statutes, which was not intended," (Schneider on Workmen's Comp. Vol. 5, § 1387, p. 116), and "would make the Act provide for insurance against disease and injury rather than against accident." Hussman-Ligonier Co. v. Hughes, 348 Mo. 319 (153 SW2d 40).[5]

---

[5]H. B. No. 228, reported to have had the approval of both labor and management organizations, was introduced during the 1962 session of the General Assembly. It provided, inter alia, for redefinition of the terms "injury" and "personal injury" as used in *Code Ann.* § 114-102 so that they would not include "heart disease, heart attack, the failure or occlusion of any of the coronary blood vessels, cerebral hemorrhage or thrombosis, epilepsy, or diabetic seizure resulting from or during the performance of the usual work of employment."

There was a substitute bill offered in committee which, inter alia, provided for a redefining of these terms so as to eliminate the same heart and coronary ailments "unless it appears from a preponderance of the competent and credible evidence that the exertion . . . was more excessive or more strenuous than that usually and regularly occurring in the course of the type of work in which the employee is engaged" and was the precipitating cause of disability or death, but excepting instances in which the employee's usual work requires regular heavy and

448

"The burden is on one seeking compensation [for death due to a heart attack] to show a *causal connection* between the employment and the death." Jakes v. Union Carbide Nuclear Co., 206 Tenn. 466 (334 SW2d 720, 726). The burden of proving the various essential elements of her case, including the establishment of a *causal connection* between decedent's employment and his fatal coronary attack rested upon the claimant, and where the evidence given by her own medical witness went no further than to show that the exertion or strain "could have" contributed to and precipitated the coronary occlusion and the evidence given by the employer's medical witness was that "the work had nothing to do with the coronary occlusion," the claimant failed to carry the burden. Welton v. State Hwy. Comm., 131 Ind. 291 (170 NE2d 450). And see *Hardware Mut. &c. Co. v. King,* 104 Ga. App. 252, 254 (1, 3) (121 SE2d 336) ; *Ocean Acc. &c. Corp. v. Bates,* 104 Ga. App. 621, 622 (122 SE2d 305). "It can not be left to surmise or conjecture, or based upon possibilities or probabilities, but must be established in a legal way, and not by guess or speculation." Rose v. City of Fairmont, 140 Neb. 550 (300 NW 574), and see *Globe Ind. Co. v. Simonton,* 88 Ga. App. 694, 696 (76 SE2d 837).

"[I]t must be shown *by evidence,* opinion or otherwise, that the exertion attendant upon the duties of employment, no matter how slight or how strenuous, and no matter with what other factors—such as pre-existing disease or predisposition to attack —it may be combined, was sufficient to contribute toward the precipitation of the attack." *Hoffman v. National Surety Corp.,* 91 Ga. App. 414, 417 (85 SE2d 784). (Emphasis supplied).

"[I]t is certainly true that when the subject under consideration is one solely within the knowledge of experts, expert

---

strenuous physical labor the performance of which is the precipitating cause of disability or death.

The substitute bill was approved in committee. In the Senate an amendment was offered which would have excepted "a disease in any form" from the definition of the terms.

Neither bill was ever adopted and no change has been made in *Code Ann.* § 114-102.

testimony, of necessity, must be believed, if uncontradicted." *Truelove v. Hulette*, 103 Ga. App. 641, 645 (120 SE2d 342). And "the board cannot ignore or arbitrarily reject unimpeached medical testimony." *Callaway Mills Co. v. Hurley*, 104 Ga. App. 811, 813 (123 SE2d 7).

"It is the general rule in this jurisdiction that laymen, *even jurors and courts*, are not permitted to say what is proper medical and surgical treatment, for that is a medical question." (Emphasis supplied). *Shea v. Phillips*, 213 Ga. 269, 271 (98 SE2d 552). What is or is not a precipitating factor when one suffers a coronary occlusion is, we think, a medical question.

And it is significant that the General Assembly has provided that in the area of occupational disease controversial issues of *medical facts* are to be determined by the Medical Board (composed of licensed, practicing physicians) and that its findings and report "upon original examination or upon appeal . . . shall be accepted by the State Board of Workmen's Compensation as *conclusive* upon the *medical questions* therein decided." (Emphasis supplied). *Code Ann.* §§ 114-822, 114-823. And see *Farrill v. Travelers Ins. Co.*, 105 Ga. App. 600 (125 SE2d 562).

Here as we have pointed out above, there was not only *no* lay testimony on the question, but the medical testimony was all in accord, and the director of the board simply "abandoned the evidence," which a trier of fact may not do (*Stephens v. Southern Discount Co.*, 105 Ga. App. 667, 672, 125 SE2d 235; *Imperial &c. Co. v. Modernization &c. Co.*, 96 Ga. App. 385 (3), 100 SE2d 107) and erred when he "refused to accept the uncontroverted opinion of an expert cardiologist" that there was no "causal connection between any work performed by the claimant's husband and the heart condition which caused his death." *Crawford W. Long Hosp. v. Mitchell*, 100 Ga. App. 276, 278, supra.

We are not unmindful of the cases in which this court has approved the application of a "natural inference through human experience" to a determination of whether or not exertion performed under certain circumstances was sufficient to have precipitated the injury. See *Hoffman v. Nat. Surety Corp.*, 91 Ga. App. 414, supra; *Callaway Mills Co. v. Hurley*, 100 Ga. App. 781

(112 SE2d 320); *McDaniel v. Employers &c. Ins. Co.,* 104 Ga. App. 340, 343 (121 SE2d 801). And we are familiar, too, with the cases holding that the jury, or trier of fact, is not bound by the opinions of experts and may disregard it or give the testimony such weight and credence as it sees fit. *Boyd v. State,* 207 Ga. 567, 569 (63 SE2d 394); *Jones v. Cordele Guano Co.,* 94 Ga. 14 (4) (20 SE 265); *American Mut. Liab. Ins. Co. v. Brackin,* 68 Ga. App. 256 (1) (23 SE2d 505); *American Motorists Ins. Co. v. Blaylock,* 84 Ga. App. 409, 412 (66 SE2d 126) and citations; *Callaway Mills Co. v. Hurley,* 104 Ga. App. 811, 812, supra.[6] But where, as here, the director had before him *no proof* that there was a causal relation between the deceased's exertion and his coronary occlusion, but did have the uncontroverted and unimpeached testimony of the doctors, including the deceased's own doctors, that there was no such relation, and since that is a medical question, we do not have a situation calling for or in which the application of a "natural inference through human experience" is proper.

This is further emphasized by the fact that the director presumptively relies only on the *competent legal evidence* before him in making his findings upon which the award is to be based, having "sifted the chaff from the wheat." *Travelers Ins. Co. v. Hutchens,* post; *Bailey v. Holmes,* 163 Ga. 272, 275 (136 SE 60); *Rowell v. Rowell,* 211 Ga. 127, 130 (84 SE2d 23); *King Sales, Inc. v. McKey,* 105 Ga. App. 787, 789 (125 SE2d 684).

Nor could any inference of causal relation arise here, since claimant's own witness refuted it, but if one could, it was entirely overcome by the medical testimony, leaving the finding and award without any evidence to support it.

Speaking personally, I do not think that there is a valid "natural inference through human experience" by which a logical conclusion can be reached contrary to that indicated by scientific research, study, experiment and reasoning. There was a

---

[6]A good discussion of the problem arising when this principle is applied in a scientific area is found in the dissent of Chief Judge Felton in *Truelove v. Hulette,* 103 Ga. App. 641, 645, supra, in which the writer here concurred.

time when we were told that the dew became poisonous in dog days and we were forbidden to walk barefoot through the weeds and grass before the sun had dried it off. Surely we now know that dog days have no such poisonous effect![7] There has been more research in the problems of the heart and circulatory system during the last ten years than in all of prior medical history. Much has been and is being learned, and much of that is and is likely to be contrary to what we may once have held to be "natural inferences through human experience."[8] We may have come far enough along with the advancement of scientific knowledge through research to find that the "unless and until" condition of *Hartford Acc. & Ind. Co. v. Waters*, 87 Ga. App. 117 (73 SE2d 70) is subject to some adjustment, particularly in connection with coronary occlusions—if it has any application there.

There was no competent evidence here to support the award. The judgment of the superior court is

*Reversed. Carlisle, P. J., concurs.*

*Russell, J., concurs specially.*

---

[7] "[T]he idea of basing treatment for disease on purgatorial acts and ordeals is an ancient one in medicine. It may trace back to the Old Testament belief that disease of any kind, whether mental or physical, represented punishment for sin; and thus relief could take the form of a final heroic act of atonement. This superstition appears to have given support to fallacious medical rationales for such procedures as purging, bleeding, induced vomiting, and blistering, as well as an entire chamber of horrors constituting the early treatment of mental illness. The latter included a wide assortment of shock techniques, such as the 'water cures' (dousing, ducking, and near-drowning), spinning in a chair, centrifugal swimming, and an early form of electric shock. All, it would appear, were planned as means of driving from the body some evil spirit or toxic vapor." *Action for Mental Health* (1961), pp. 27-28.

[8] "[M]edicine belongs to the class known as inductive sciences. The data is constantly shifting with new discoveries, and the conclusion which may be considered sound today is repudiated tomorrow." Bixby v. Omaha & C. B. Ry. &c. Co., 105 Iowa 293 (75 NW 182).

Russell, Judge, concurring especially. I concur in the result, but not for all of the reasons stated in the opinion.